**BURLESON v. EARNEST et al.**

No. 5315.

Court of Civil Appeals of Texas. Amarillo.

June 16, 1941.

Rehearing Denied Sept. 8, 1941.

E. L. Klett, of Lubbock, and Joe J. McGowan, of Brownsfield, for appellant.

Bean, Evans & Bean, of Lubbock, and Joe Earnest, of Colorado City, for appellees.

STOKES, Justice.

On the 21st of September, 1934, Judge C. H. Earnest, a resident of Mitchell County, executed a deed conveying to L. G. Stone of Terry County, section No. 135, in Block D-11, in the latter county, for a consideration of $640 cash and three vendor's lien notes, the first two in the sum of $750 each and the third note in the sum of $860, due one, two and three years after date. On the 14th of September, 1934, Judge Earnest and his wife, the appellee herein, conveyed to Andrew Sims section No. 57, in Block D-14, in Terry County, for a consideration of $2,560, of which amount $640 was to be paid in cash and the balance evidenced by three vendor's lien notes in the sum of $640 each, due one, two and three years after date. On October 5, 1934, Judge Earnest sent these deeds, with the notes, to the Brownfield State Bank with instructions to deliver the deeds to the grantees upon payment of the cash consideration called for therein and the execution by them respectively of the vendor's lien notes, after which the bank was authorized to pay appellant, R. C. Burleson, the total sum of $278 as commission for making the sales and remit the balance of the cash payments, together with the executed notes, to the grantor. At the time of this transaction, the First National Bank of Fort Worth held a lien on the land to secure the payment of an indebtedness owing to it by Judge Earnest and in the letter transmitting the deeds and note to the bank at Brownfield Judge Earnest also enclosed a release that he had procured from the Fort Worth bank releasing the indebtedness as to the two sections of land here involved. The deeds, notes and release were received by the bank at Brownfield and the transaction closed on October 22, 1934, when the bank immediately returned the balance of the cash consideration, together with the executed notes, to Judge Earnest and he, in turn, remitted the cash which he had received in the transaction, together with the executed notes, to the First National Bank of Fort Worth, the cash to be credited on his indebtedness and the notes to be held by the Fort Worth bank as collateral, taking the place of the lien which it had theretofore held against the land.

On February 16, 1935, Judge Earnest died, leaving a will in which he bequeathed all of his property to his wife, the appellee herein. For sometime before his death, Joe Earnest, his son, had been a student and teacher in Columbia University of New York City but, upon the death of his father, Joe returned and assumed the responsibility of assisting his mother in the management of the estate. On October 1, 1935, Joe Earnest, by letter, inquired of appellant about the Sims and Stone notes, stating that he was in receipt of a letter from the First National Bank of Fort Worth in which he was informed that the first of each of the two series of notes was past due and unpaid, and seeking information as to whether or not Sims and Stone had forwarded remittances to the bank, and inquiring as to the addresses of the makers of the notes. Appellant replied to the inquiry by letter of October 5, 1935, in which he informed Joe Earnest that

he, Burleson, advanced to Sims and Stone the money with which they had consummated their purchase of the lands and that, on account of the fact that their crops had not turned out as well as they expected, appellant "had to go on and buy the land from them" to protect himself. In this letter he also stated that he had written the Fort Worth bank that he could pay all that was due by November 1st and would pay the entire balance represented by the notes by January 1st. On January 6, 1936, after receiving appellant's letter of October 5, 1935, appellee, Mrs. Fannie C. Earnest, accompanied by her son, Joe, went to Brownfield and made an investigation of the matter, which included an examination of the deed records of Terry County, from which they learned that on October 22, 1934, the day upon which the sales of the land to Stone and Sims were completed by the bank's delivery of the deeds to the grantees, Sims and Stone had conveyed the land to appellant. The record shows that Joe Earnest continued his investigation of the matter until July 31, 1936, and then, on behalf of his mother, and in her name as plaintiff, he filed this suit against appellant Burleson and Andrew Sims, L. G. Stone and the First National Bank of Fort Worth. The original petition is not brought up in the record but in her second amended original petition filed September 11, 1939, upon which the case was tried, appellee alleged that appellant was the agent of her husband, C. H. Earnest, deceased, and represented him in the sales of the two sections of land. She set out the details concerning the sales and alleged that Stone and Sims were not bona fide purchasers of the land but that they were acting as dummy purchasers for and on behalf of appellant. She alleged that in truth and in fact appellant, while acting as the agent of her deceased husband, had, through the device of having the lands conveyed to Sims and Stone, become the purchaser thereof in fraud of the rights of her deceased husband, and prayed for a recovery of the lands and cancellation of the deeds executed by C. H. Earnest to Sims and Stone and the deeds executed by them to appellant.

In her petition appellee alleged appellant had been paid $278 as commission for making the sales and that, while in possession thereof, and holding the title thereto, appellant had executed to the Uscan Oil Company an oil and gas lease on section No. 57, for which he had received a cash consideration of $1,280. In her petition appellee offered to do equity and tendered all amounts that had been received by her or her husband as part of the purchase price of the two sections of land, after deducting therefrom the amounts received by appellant as commission and as consideration for the oil and gas lease.

Appellant answered by the general issue and specially alleged that after discovering the alleged wrongs and injuries set forth in her petition, appellee had waited and delayed an unreasonable length of time before notifying appellant of her disaffirmance and rescission of the sales whereby the entire transaction had been affirmed and acquiesced in by her, by reason of which she was not entitled to recover the land. He also included a cross-action for damages for malicious prosecution of the suit and the filing of lis pendens.

On July 29, 1940, the First National Bank of Fort Worth filed an answer in the nature of a cross-action against appellee, Fannie C. Earnest and appellant, in which it set up the second and third notes of the series executed by L. G. Stone, all of the other notes having been paid, and asked for a personal judgment against appellee and foreclosure of its lien against both appellee and appellant. No personal judgment was sought against appellant because in the deed which Stone executed to him appellant took the land subject to the indebtedness and did not assume its payment. Joe Earnest acted as attorney for the bank in filing the cross-action and signed the same as such.

The case was tried September 2, 1940, and submitted to a jury upon special issues. In answer to the questions propounded to them, the jury found that at the time C. H. Earnest placed the deed to Stone in the Brownfield State Bank it was not the intention of appellant to become the owner of the property described therein, which was section No. 135, but that he had such intention when the bank delivered the deed to Stone. That appellant did intend to become the owner of section No. 57 at the time C. H. Earnest placed the Sims deed in the bank, and that he had such intention when the Sims deed was delivered and the transaction closed. They found that the value of the use and occupancy of section No. 135, known as the Stone section, during the time appellant had pos-

session thereof, was $1,024, and that the value of the use and occupancy of section No. 57, known as the Sims section, during the time appellant had possession thereof, was $160. In answer to the seventh and last special issue the jury found that neither the plaintiff nor her agent, Joe Earnest, had failed for an unreasonable length of time to disaffirm the sales of the land after they learned of the purchase thereof by appellant.

Based upon the verdict of the jury the court entered judgment in favor of appellee for the title and possession of the two sections of land and for cancellation of the deeds from C. H. Earnest to Stone and Sims, together with their deeds to appellant. It was further ordered and decreed that appellee pay into the registry of the court for the benefit of appellant the sum of $1,280, being the amount paid as cash and upon some of the notes by appellant for the two sections of land, less the amounts received by him from the oil and gas lease and the commission paid him for making the sales and the amount found by the jury as the reasonable value of the use and occupancy of the lands. Appellant's motion for a new trial being overruled, he perfected an appeal to this court and the case is now before us for review.

Appellant contends that the judgment should be reversed because, first, it is shown by the record that he was not clothed with any discretion, trust or confidence in making the sales and that he acted in the transaction only as a middleman and was guilty of no wrong. He further contends in this connection that, even though he was an agent and could not legally become the purchaser without notice to his principal, there is no evidence that the principal did not have full notice of the fact that he was the real purchaser. Secondly, that the jury found it was not his intention to become the purchaser of the Stone section when C. H. Earnest executed the deed and sent it to the bank on October 5, 1934, and there being no finding that he had an intention to become the purchaser of the Sims section before September 14, 1934, when C. H. Earnest contracted to sell the same, the contract was binding and appellant's subsequent intention could not alter it. Thirdly, that the judgment rescinding the sale cannot be sustained because it is shown that appellee elected to enforce the terms of the sale, and fourthly, the court erred in allowing appellee to recover the $1,280 oil bonus, in addition to the $1,024 and the $160 found by the jury to be the value of the use and occupancy of the land.

Referring to the first contention of appellant it is unquestionably the law that if a broker, under his contract with his principal whereby he becomes concerned with the sale of his principal's property, is charged with no responsibility and is not obligated to exercise any discretion, but his duty consists merely of bringing the parties together so that, between themselves, they may negotiate a sale, and the sale is made in that manner, the broker is considered a mere middleman and is not necessarily the agent of either party. Johnson v. Edrington, Tex.Civ.App., 53 S.W.2d 69; Allen v. Roach, Tex.Com.App., 292 S.W. 195. We know of no case, however, which holds that the ordinary real estate broker may be so considered where it is not shown that the parties to the transaction were fully aware of the restricted relationship. A broker usually is understood to be one who is engaged by others on a commission basis to negotiate contracts relating to property. He is recognized as an agent employed to make or negotiate bargains or contracts for the sale or lease of real estate or other property between other persons and for which he is paid a commission. The commission is usually paid by the seller and the broker generally is recognized as the latter's agent. Menefee Lbr. Co. v. Davis-Johnson Lbr. Co., Tex.Civ.App., 13 S.W.2d 962; Texas Brokerage Co. v. Barkley & Co., 60 Tex.Civ.App. 466, 128 S.W. 431. We do not find anything in the record in this case which indicates that appellant's relationship with C. H. Earnest was anything other than an ordinary agent. While testifying on cross-examination Joe Earnest said that appellant had been his father's agent and that he, Joe, recognized his right to a 5% commission for the sale of the land. The record contains a letter written to appellant by Judge Earnest on March 20, 1933, in which, among other things, he said to appellant "with all due respect and sincerest appreciation of your efforts in my behalf, it is my opinion that we had best call off that deal for Waco property." While this communication had reference to an entirely different transaction, yet it shows that Judge Earnest considered appellant his agent at that time and that appellant had been making efforts in behalf of Judge Earnest to bring about an exchange of some of his property for prop-

874

erty located at Waco. A number of letters are contained in the statement of facts which show that appellant was attending to various business matters of Judge Earnest in Terry County. In one of these he stated that Sims and Stone were both ready to close the transaction if the release was satisfactory, presumably the release of the First National Bank of Fort Worth. In another, he stated that he would get Sims and Stone to close the deal just as soon as he could do so, and in still another he wrote to Judge Earnest that L. G. Stone would accept Judge Earnest's proposition of $640 cash and three years on the balance at 7% as outlined in a former letter written to Judge Earnest concerning the matter. In this letter he also stated that he had $100 as Earnest's money on the Stone trade. There is nothing in the testimony to indicate that the purchasers of this land and Judge Earnest were ever brought together or conferred with each other relative to the transaction except through appellant, and we do not find any basis upon which to poise the conclusion that appellant was acting merely as a middleman nor that his duties were limited merely to bringing the parties together in order that they may negotiate their own trade.

The law is well established in this state, as well as every other jurisdiction in this country, that in all cases where the relationship of principal and agent is shown, the principal is entitled to the best efforts and unbiased judgment of his agent. For reasons founded in public policy the law denies the right of an agent to assume any relationship that is antagonistic to his duty to his principal, and it has many times been held that the agent cannot be both buyer and seller at the same time nor connect his own interests with property involved in his dealings as an agent for another. In the early case of Shannon v. Marmaduke, 14 Tex. 217, Justice Wheeler, writing for the Supreme Court concerning this rule of law, quoted with approval an expression of Chancellor Kent which said:

"The rule is founded on the danger of imposition and the presumption of the existence of fraud, inaccessible to the eye of the Court. The policy of the rule is to shut the door against temptation, and which, in the cases in which such a relationship exists, is deemed to be, of itself, sufficient to create the disqualification. This principle, like most others, may be subject to some qualification in its application to particular cases, but, as a general rule, it appears to be well settled in the English and in our American Jurisprudence."

The courts have, throughout the entire history of our jurisprudence, shown a jealous attitude toward an agent who becomes involved in the property of his principal and have held him to strict account for his dealings upon the ground that as agent for the vendor, his duty is to sell at the highest price, even though a price might have been set by the owner, since as agent for the vendor it is his duty to assist his principal in procuring the best price possible, while, if he has a selfish interest, he will be inclined to procure the property at the lowest possible price. Even where the parties bargain for themselves, once the agency is established, the principal is entitled to the skill, knowledge and advice of his agent and to communicate with him without the slightest fear of betrayal. Scott v. Kelso, 62 Tex.Civ.App. 163, 130 S.W. 610. The question, therefore, does not relate to the mala fides of the agent nor to whether or not a greater sum might have been procured for the property, nor even to whether or not the vendor received full value therefor. The self-interest of the agent is considered a vice which renders the transaction voidable at the election of the principal without looking into the matter further than to ascertain that the interest of the agent exists. Nabours v. McCord, 100 Tex. 456, 100 S.W. 1152, Hume v. Baggett & Baggett, Tex.Civ.App., 221 S.W. 1002.

Appellant makes the further contention in reference to this phase of the case that there is no evidence in the record to the effect that the principal, C. H. Earnest, did not have notice that appellant had become the purchaser and that, even if it be admitted that it was appellant's intention thus to procure the land, that Judge Earnest was not fully advised of it and consented to it. The answer to this assertion is that when it is shown that the agent became interested in the sale of his principal's property, fraud in acquiring such interest is presumed and the burden rests upon the agent to show that his principal had full knowledge, not only of the fact that the agent was interested, but also of every material fact

known to the agent which might affect the principal and that, having such knowledge, the principal freely consented to the transaction. Southwestern Investment Co. v. Green, Tex.Civ.App., 19 S.W.2d 102; Trippett v. Nash McLarty Motor Co., Tex. Civ.App., 269 S.W. 205. The testimony is undisputed that appellant acquired the title to the two sections of land here involved on the same day the sales to Stone and Sims were closed by the bank at Brownfield on behalf of Judge Earnest. As we have already said, there is no question that, under the relationship shown by the record between appellant and Judge Earnest, appellant was his agent in effecting the sale. As far as the record shows, neither Judge Earnest during his lifetime nor appellee, his surviving wife, nor Joe Earnest, knew, until January 6, 1936, that appellant had procured the title to the land simultaneously with the closing of the sales to Sims and Stone. When appellant wrote Joe Earnest concerning the matter in October, 1935, he indicated strongly that he had not procured the title to these lands for quite a long time after they had been sold to the original vendees. He stated in that letter that the crops of the vendees had not turned out as well as the purchasers had anticipated and that it was for that reason that he was forced to take over the land in order to protect himself in loaning them the money which they had paid as cash consideration. Instead, therefore, of informing his principal and giving him full information concerning appellant's connection with the transaction, he withheld the vital fact that he had procured the title on the same day the original sale was consummated. We cannot agree with appellant in his contentions that the record does not show he was guilty of any wrong, nor that he was a mere middleman in the transaction, nor that the burden of proving that Judge Earnest did not know the details concerning the matter rested upon appellee, and his assignments of error in reference to those matters will be overruled.

■ The second contention made by appellant is that, since the jury, in answer to the first special issue, found that he did not have the intention to become the purchaser of the lands on October 5, 1934, when Judge Earnest executed the deed to Stone and sent it to the bank at Brownfield, and since there is no finding of the

jury that he had the intention to become the purchaser of the Sims section on and before September 14, 1934, when Judge Earnest executed the contract to sell section No. 57 to Sims, judgment should not have been rendered against him because the deed and contract were binding upon Judge Earnest and appellant's subsequent intention to become the purchaser could not affect nor alter that liability. The record shows that none of the cash payment except perhaps $50 was ever furnished or paid by either of the grantees in the deeds executed by Judge Earnest, but all of it was furnished to them by appellant who, as we have shown, was acting as the agent of the seller. Even if appellant did not know at the time the deeds were executed and delivered to the bank that the grantees could not make the cash payments and although his intention to furnish the money to them and thus inject his interests into the transaction was formed after the deeds were executed, it was his duty to inform Judge Earnest of the true situation and place him in possession of all the facts in connection with it. He was entitled to know that Stone and Sims were not able to carry out the transaction and to know every other material fact that was known to appellant which might affect the vendor's actions in the matter. The controlling question in such cases is, Did the interests of the agent become antagonistic to that of his principal through the acts and conduct of the agent in becoming interested in the consummation of the transaction? The sales were not closed nor the deeds delivered until October 22, 1934, and the transaction was pending until the deeds were actually delivered. Even under appellant's version of the matter, when he furnished to the purchasers the money with which to make their cash payments, he knew that it was at least possible, and we think under the circumstances shown by the testimony, very probable, that, at least at some time, he would have to take the land in order to recoup the money he had advanced to them. He, therefore, injected his own interests into the transaction even before it was finally closed. As held by the Supreme Court in Nabours v. McCord, supra [100 Tex. 456, 100 S.W. 1154], this self-interest was such a vice as "leveneth the whole lump" and rendered the transaction voidable at the election of the grantor without looking further into the

matter than to ascertain that the interest existed. Tyler v. Sanborn, 128 Ill. 136, 21 N.E. 193, 4 L.R.A. 218, 15 Am.St.Rep. 97; Hammond v. Bookwalter, 12 Ind.App. 177, 39 N.E. 872. In our opinion, there is no merit in the assignments of error raising these questions and they will be overruled.

Appellant next contends that the judgment rescinding the sale cannot be sustained because it is shown by the record that appellee elected to enforce its terms. Under this assertion appellant presents an imposing list of acts on the part of appellee and her agent, Joe Earnest, which he contends were such as to establish the fact that she affirmed and acquiesced in the manner in which the sales were consummated and which resulted in his acquiring the title. He contends in this connection that appellee waited seven months after being fully apprised of all the facts on January 6, 1936, before she filed this suit for rescission and recovery of the lands, and he claims that such delay had the legal affect of an affirmance or ratification of the manner in which the transaction was consummated. Without going into detail as to the testimony relating to this question it will be sufficient, we think, to say that it was shown that the postoffice addresses of Stone and Sims were not known to appellee nor to her agent, Joe, and the latter's testimony reveals marked diligence on his part to locate them. He wrote a number of letters and upon ascertaining that one of the parties might be located at Joplin, Missouri, he immediately communicated with a friend there who seems to have made a thorough search and was unable to locate him. He inserted some kind of an advertisement in the local newspaper at Brownfield and did many other things in his efforts to locate Stone and Sims for the purpose of ascertaining from them the details concerning the manner in which, and the reason why, the land was conveyed by them to appellant on the very day his father's deeds were delivered to Stone and Sims. Not being able to locate these grantees, he filed the suit for his mother on August 31, 1936, and under the circumstances shown by the testimony, we cannot say that, as a matter of law, such delay resulted in an affirmance or acquiescence on the part of appellee. The jury found against appellant on the matter of unreasonable delay and there is ample evidence to support the finding.

Appellant next contends here that the act of Joe Earnest in representing the First National Bank of Fort Worth as its attorney and filing its answer and cross-action in the instant case in which the bank sought a personal judgment against appellee, Mrs. Fannie C. Earnest, and foreclosure of its vendor's lien on the land involved as against appellant, constituted an affirmance of the transaction as actually consummated. In his testimony Joe Earnest gave as his principal reason for acting as attorney for the bank that the notes would become barred by limitation, indicating that he and his mother were interested in keeping the notes and lien alive. The record shows that the last note upon which foreclosure was sought was due and payable on the 21st of September, 1937. The answer and cross-action of the bank was filed in this case July 29, 1940, almost three years after the due date of the last of the series of notes sued upon, and practically four years after this suit was filed by appellee. There is nothing in the record which indicates that appellee knew her son Joe was acting as attorney for the bank or that she acquiesced therein, but, even if she did, we can find no reason to conclude that such act on his part constituted an affirmance or ratification of appellant's act in acquiring the title to the lands. Such matters as affirmance, acquiescence, and ratification present questions of fact. Iron City Bank v. Fifth Nat. Bank, Tex.Civ. App., 47 S.W. 533; Chenault v. Honaker, Tex.Civ.App., 261 S.W. 825. They are based upon acts, conduct or statements which imply an agreement or conclusion to accept the consequences and approve the manner in which a transaction has been consummated and waive any elements thereof which may have resulted in a right of action or given legal warrant for repudiation. There is no element of estoppel involved in any of these contentions concerning ratification or affirmance and if appellee may be charged with having affirmed the transaction, it is purely upon the conclusion that, from her acts and conduct, she intended to, and did, waive her right of rescission and that appellant had the right to draw a conclusion that such was her intention. It is obvious from the record in the case that no such conclusion could have been drawn, because appellee's suit to rescind the transaction was then pending and the cross-action of the bank was filed in the pending suit, the very suit

in which appellee was seeking to rescind. Appellant could not, therefore, have believed that appellee, by consenting to her son and agent acting as attorney for the bank, intended to waive her rights, because her pleadings in the case loudly proclaimed the exact opposite. The contention of appellant that, by filing the cross-action, appellee's agent was seeking to force appellant to pay the notes is answered by her tender and offer to repay him all he had paid out, and by the testimony of Joe Earnest that the tender included anything appellant may pay upon the pending notes. Moreover, the notes were not under appellee's control. They were in the hands of the Fort Worth bank where they were held as collateral security to the indebtedness of her deceased husband. The notes being past due, the bank had the right to file the cross-action or institute an independent suit to foreclose the vendor's lien. Appellee, therefore, cannot be charged with the consequences of the bank's action in filing the cross-action and seeking foreclosure nor did the act of her agent in filing the cross-action as attorney for the bank constitute an affirmance, acquiescence in, or ratification of, appellant's act in becoming the purchaser of land, for the sale of which he was acting as agent for the seller.

 Appellant asserts a number of other reasons why the acquisition by him of the title to the lands was affirmed by appellee, such as the acceptance of his offer to pay the notes made to Joe Earnest in October, 1935, and the payment of a portion of the notes after that date, but obviously these things do not present any evidence of affirmance because appellee had no knowledge of the salient facts until January 6, 1936, and the notes that were paid by appellant were paid to the bank at Fort Worth where the notes were held as collateral security. Appellee had no control over the matter of their collection. Furthermore, the record does not show when the discharged notes were paid. If they were paid before January 6, 1936, when she learned that appellant had acquired the land simultaneously with the closing of the original transaction, it certainly could not be contended that such payment, even if it had been made to her in person, would have constituted an affirmance or ratification.

 The fourth and last contention presented by appellant is that the court erred in allowing appellee recovery of the $1,280 received by appellant as consideration for the oil and gas lease on section No. 57, in addition to the $1,024 and the $160 which the jury found were the values of the use and occupancy of the respective sections of land. The oil and gas lease is copied in the statement of facts and is in the usual form which grants, leases and lets exclusively unto the lessee for the purpose of investigating, exploring, prospecting, drilling and mining for, and producing, oil, gas and other minerals from the land. Under the holding of our courts the lease constituted a grant and conveyance, for the time covered by it, of oil and minerals in place. This is held by our courts to be, in effect, a conveyance of a portion of the land. Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566. There is no intimation in the record that the oil lease interfered in any manner with appellant's use and occupancy and we think the consideration received therefor could not be considered other than an item of secret profits acquired by appellant while the land was in his possession and under his control. The law does not permit an agent to receive and retain for his own benefit secret profits from property in relation to which he is acting in behalf of his principal. He must account for all profits so received. Southwestern Investment Co. v. Green, Tex.Civ.App., 19 S.W.2d 102; Smith v. Smith, Tex.Civ.App., 213 S.W. 273; Stein v. Sims, Tex.Civ.App., 283 S.W. 319.

We have considered all of the assignments of error and propositions of law urged by appellant and, in our opinion, no reversible error is shown by any of them. The judgment of the court below will, therefore, be affirmed.